May it please the Court, Alan Dershowitz on behalf of Appellant David Tamman. I would like to reserve three minutes, Your Honor, for rebuttal. In 1985, this Court in the Corcoran case implored, urged, and expected the district courts to personally inform every defendant of the benefits and burdens of jury trials before he accepts a waiver of a jury trial, including the right to a unanimous verdict by 12 jurors. But the Court said in the absence of additional factors, they did not reverse. Nine years later, in the Christensen case, this Court said that Corcoran did everything but require such colloquies, and that in cases such as this one, where there are additional factors, such as in the Christensen case, a reason to suspect incompetence, we must, quote, now require them to do so. And then in the Bishop case in 2002, a case not including any claim of incompetence or any additional factors, the Court did affirm, notwithstanding the fact that there were no colloquies. It's not surprising, therefore, that the Court in this case, as many other trial courts apparently, like in the Bishop case, simply failed to advise Tamman of what the Corcoran Court admonished and expected the district courts to advise. Now, in this case, there was a special circumstance. The Court below failed to conduct the required in-depth colloquy, even after the defendant stated on the record, quote, I take certain medications. But I'm not, I don't think he was incompetent. I didn't say that he was. No, that's what I'm asking. Was he incompetent? Again, we don't know the answer to that, because the judge should have. If the question is competence or not, then the question of the warnings is largely irrelevant, isn't it? No, no. Because the competency or incompetency is the one factor. The way the case law in this circuit has developed, from Christensen to Shorty, is that if there are no additional factors, although the Court admonishes trial courts to give the four factors, they will not reverse. But if there are additional factors, those additional factors could be suspicion of possible incompetency, language difficulty, and a range of many others. What we're arguing is that this case, when the trial judge elicited the fact that he was taking medications and he didn't know whether he was under the influence, they were obliged to ask the following question. What is the medication you're taking? In what dosage? In what amounts? How frequently? Had they asked that question, Your Honors talked about a prover before, they would have learned that he was taking 80 milligrams of POSAC, 45 milligrams of Welbertin, 4 milligrams of Cloperton, Ambien, and possibly Gabapentin. That is an enormous amount of disabling drugs. Had the judge learned that by simply asking that question, he then ----  Well, the report that was made on sentencing, which is part of this record ---- We have a doctor's report that he's unsure what the, what the, what that combination would result in. And when we have uncertainty, the default position is always not to accept a waiver. You cannot accept a waiver in the face of uncertainty. But you said that was an enormous amount of drugs. It is an enormous amount of drugs. Suggesting that it was such an enormous amount that it would have impaired his judgment. Yes. And Judge Bybee asked you, well, how do you know that? Well, you referred to a doctor's report that says he's not sure. Well, and not sure is enough, Your Honor. Not certain is enough. I mean, it's an enormous amount of drugs. The court can take ---- He's not sure. Well, the court can take, the fact is that this is an enormous amount of drugs. Now, there's no record of that at this point, and there's no record of it because the judge failed to abide by Christensen and failed to abide by Cochran. Here's what I don't understand in your argument, counsel. I don't understand, if you're arguing that he's incompetent, I'm not sure why that affects the nature of the district court's obligation to give him a warning. Because if he's incompetent, he shouldn't be taking, he shouldn't be ---- Here's the simple answer, Your Honor. Shouldn't allow him to waive the jury right at all. That's right. That's right. Here's the answer to that. There was enough here to raise the issue of possible incompetence, which under Shorty says that's the additional factor that requires two things. Number one, the four warnings. So is your position that on this record, the district court was obligated to give him the warning about the trial court? Absolutely. And if he continued to waive it, you would have an argument here? I would have an argument because there are two issues here. The Christensen case shows there are two independent issues. Number one, do you get the warning about the four factors? Number two, do you have to engage in an in-depth colloquy? And what we're saying here is there was a triggering event, namely, I don't know whether I'm under the influence, which required that both. So this is a much stronger case than Shorty. In Shorty, the Court said only two of the four were given. This is a much stronger case than Cochran and then Christensen because in that case the warnings were given, but there wasn't an in-depth colloquy. Here we have both. Did the district court ask Mr. Thomas Counsel whether he thought that he was competent to waive it? Of course. And, of course, Mr. Thomas Counsel had no idea what drugs he was taking. He had no ---- What did his counsel say? He asked four or five yes-no questions, all designed to elicit no answers, to move on. Let's get on with this. Let's get a waiver. And all the lawyer said was no, no, no. Well, yes, yes, yes. Let me ask you this, if I may. Taking Prozac and Welberton suggests that he was being treated for depression. Is that right? Yes, among other things. What were the nature of his mental difficulties for which he was receiving these drugs? Many things. He was unable to make decisions. If you read the report, you'll see that. And your Honors are all aware of a famous case, of course, involving Judge Wachtler in New York, who was sitting, as you are sitting here today, rendering justice during the day. But when he was taking heavy medications, he was engaging in all kind of bizarre conduct. There are many people around this counsel who take Prozac and Welbuterin every day and function just fine. That's right. And there are some who don't. It's depending on the nature and the extent, and that's precisely what the judge would have required. The district court asked his counsel whether he had noticed anything. He said no. The district court said, from my observations, I don't see a problem here. Mr. Tammon said he didn't know whether he was impaired or not. And the district court could have the opportunity of seeing his demeanor and his conduct in court. Your Honor, you can't see this kind of thing in the demeanor in court. You don't know what kind of drugs somebody is taking. You don't know the effects. You can see whether people are answering questions, but they're looking at you. That's exactly what this Court said you cannot do. Exactly what this Court said in a series of cases is not enough if counsel says that it looks like he's confident. First of all, here you have a lawyer who's scheduling his vacation, who wants to waive trial by jury. Everybody in that courthouse wanted to waive trial by jury because it was convenient and efficient to do so, except Mr. Tommon. Except that he said he wanted to. Except he wanted to. But the question is, was he confident at the time to make that judgment? May I ask a question? Sir, please. I'm sorry. He's being treated for depression. Among other things. How serious was the depression? Very serious. It was very serious. Read the report. Would you characterize that he was being treated for a mental illness? Well, that's always a hard question of diagnostic category. He didn't think so. If he's being treated for serious depression, in ordinary talk, I think including in medical talk, you would say he's being treated for a mental illness. I would agree with that, Your Honor. He was just asked. I know. Have you been treated recently for any mental illness? Right. No, I have not. Because he didn't regard it as a mental illness. And that's a matter of semantics and controversy. There are many people who don't think they're being treated for mental illnesses. But if you ask the psychiatrist, and they did ask the psychiatrist, the psychiatrist said they were being treated for mental illness. That's why you needed inquiry. That's why you needed a probing colloquy, to find out precisely what was going on, so a court could make an informed judgment. I have to say, I understand why you're focusing on this, because it's about the only thing you've got. But here we have a man who is helping out, has been convicted of, accessory after the fact, for fairly sophisticated financial fraud, who's very well educated, who's giving no external signs of mental difficulty, who answers these questions quite straightforwardly. I just don't get it. Well, Your Honor, if you look at the cases, you'll see that that replicates other cases. There are other cases as well, where you have sophisticated people who graduated fine institutions, and who — Which one did he go to? He went to USC law school, and — Somebody said Ivy League. USC is not Ivy League. Well, I think he went to Dartmouth College. Dartmouth undergraduate. Yeah, Dartmouth undergrad. I see. It's not an Ivy League law school. Right, right. In any event, Your Honor, I can assure you this. Having taught at Harvard for 50 years, my students, when they graduate, do not know that the Supreme Court has said that you do not need unanimous juries in State cases, you do in Federal cases. These are not issues that are known to securities lawyers. And he had a right to know that he was waiving an opportunity to help select a jury, to help try to find a jury that would have one person on it or two people on it, who would think that if they had heard the expert, and I want to move into that for a second, Your Honor, if they had heard, Your Honor says there's nothing left, I want to try to persuade you that you're wrong, that we have two other issues in the case. There were two essential theories in this case. Number one, that David Talman, a distinguished and very, very able lawyer who had no obvious — Counsel, I hate to interrupt you. Your time is running quickly. I'm more interested, most interested in the sentencing issue, and I hope that you'll get to that before your time is up. I will get to that issue, Your Honor. Before you do, Mr. Dershowitz, one quick one. You are experienced, and you understand that a district judge is not going to know the defendant well. But the lawyer who has been representing the defendant for a very long time and discussing things with them and preparing for the trial and preparing for the hearing is going to know the defendant well and know how they react, how they behave, how they interact. So for a district judge, in questioning a defendant about their ability to understand the proceedings, the go-to person is the person who is the one who has interacted with that individual on a daily basis and is an officer of the court. And that's what happened here. And the lawyer indicated at every turn that things were fine. And that's exactly what the Ninth Circuit has said you cannot do, that you cannot rely on the word of the lawyer. Lawyers, number one — The judge also observed the defendant. Okay. Short of getting down off the bench and putting out a stethoscope — What is the downside, Your Honor? What is the judge supposed to do? What is the downside of the judge saying, tell me the drugs, tell me the dosage, we'll send it to probation service, we'll find out if it is an extraordinary amount, whether it's the kind of combination of dosages which might affect your judgment, make you accept your lawyer's recommendation to waive this most important right. In all the cases that the court reversed, in every single one of them, the lawyers gave that advice. The lawyers said. The lawyers signed the little checklist. But that wasn't enough. What this circuit has said is if there is any factor, in addition to the usual absence of factors, then the four conditions have to be set out, and if there is any suspicion of any kind of incompetence, then there has to be a probing inquiry. So you want basically a bright line. So if the defendant gets up there and says to a district judge, I'm taking Valium, immediately the judge has to stop the proceedings and send the defendant for a mental exam. No.     No.  No.     No.                    What good would that do? Because the judge is not a medical doctor, and even medical doctors would have to examine the individual patient, all of the interaction of their drugs, their body weight, their height, their metabolism, their prior medical history, to know how those drugs were impacting that particular individual at that moment. That's right. And that should be done in any case where a person tries to enter a guilty plea or tries to waive an important right like the right to trial by jury. If he answers the question that the amounts raise a level of suspicion, all we're saying is the Ninth Circuit rules are clear. That is the only time you can affirm a conviction when the judge has admittedly, as in this case, failed to give the full warnings, or when there are no additional facts. The additional facts are linguistic. The additional facts are psychological. And so the Ninth — Do you want to get to the sentencing issue? I do, but I really would like to — You've got a minute and 45 seconds. Your Honor, we only get a remand on the sentencing issue. I would like to try to persuade the Court in my — You've got a minute and 45 seconds. I have a minute. I'm going to try to, in one minute, persuade the Court that the hearsay issue is a crucial one because the relevant question here was did he do it for money or did he do it because he had conflicting obligations. And here we have a pure hearsay statement. The State will concede. It's a hearsay statement. And the claim they make is in furtherance of the conspiracy because it saved the conspiracy money. Saving the conspiracy money is so open-ended an argument that it was without limit. And we ask, Your Honor, to consider seriously the hearsay argument and the expert argument because that denied the defendant the right to put forth an expert on legal ethics to simply put in context, in context, the issue of how complicated this was. I only have a minute. I would like to reserve it for rebuttal. If I have an additional minute on rebuttal, I will address the sentencing issue. And we will give you one minute on rebuttal. Okay, Your Honor. So the sentencing issues, there are two kinds of sentencing issues in this case. Number one is whether or not the Court can make a judgment that there were 50 or more investors and $22 million. I'd like to turn right to the double-counting problem. Okay. The double-counting problem, Your Honor. Okay. The double-counting problem, and it was different from but somewhat similar to the And that is, there were two claims. Number one, we do not dispute the fact that Ferrari, the main culprit in this case, deserved the enhancement, and therefore, our client, as an accessory, had to get that enhancement. The question was, can you then add the enhancement for special skills based on the fact that he was a lawyer? Now, logically, you might argue you should be able to from a practical point of view. The problem is that the law, the words of the regulations, seem fairly clear that you can't double-count. You can't double-count with respect to the principle, whether it's double-counting or whether you can do it with respect to the accessory after the fact. That's the question. That's the question. And that, I think, is a serious question. We're aware of no direct case law on that issue. And it seems to me that principles of lenity, obviously, require that when in doubt and when the words of the regulations seem to incline against that, that you resolve those doubts. And the rules of the regulations you're talking about are the commentary, not the guidelines themselves. Right, right, right. And so, Your Honor, we ask you to look seriously at that double-counting issue, but we ask you please to look, I know Your Honors will, look seriously at the hearsay as well as the expert testimony issue and at the issue of what the law on the Ninth Circuit is on incompetency. Thank you, Your Honor, for giving me the extra time. Thank you so much. I appreciate it. Let's hear from the government. Good morning. May it please the Court. Paul Stern for the United States. To begin with, we would submit there's no evidence in this record that at the time the defendant waived jury, he was subject to any mental problems or he was under a substantial regime of medication. If you look at the Builder Report, and we address this issue on page 29 of our answering brief, footnote 17, the Builder Report deals with a report of what the defendant is being treated for seven months after the trial was completed. And it identifies a regime of medications he was taking at that time. Then it also goes back to a, I presume it's a complete workup of defendant's, you know, psychological treatment and medical treatment, and it identifies a period of time between 2009 and 2012 up until April of 2012 where he was being treated by another doctor and taking a bunch of medications in connection with that. But it is silent with respect to what medications the defendant was taking between April of 2012 and I think around June of 2013. The defendant waived jury in October of 2012. So we don't frankly know if the defendant was being treated at all at that time. And that, moreover, is consistent with his answer at the colloquy to the question, is he being treated, has he been recently treated for mental illness or for any addiction to narcotics. So we would respectfully submit that there's nothing in this record to indicate that at the time he was under treatment. And then if you look at the colloquy itself, the only thing that's in the record to support a defendant's contention is a statement that when he was asked, after he'd been put under oath, whether he was under the influence of taking medications, then he said, I'm not, appearing to say I'm not under the influence. And then he said, I don't know if I'm under the influence. We would respectfully submit that that is an ambiguous statement. It may mean that he's simply being very careful, he's taking some medications, and he may indeed be under the influence of them. If you were taking If a medication is efficacious, you are necessarily under the influence of the medication. I think that is certainly a reasonable construal of the phrase. After that, the court followed up to determine the other interpretation of that phrase, which I think the defense favors, is that under the influence means that somehow he's being affected or impaired by the medications. And the court then followed up. Even though he had a written waiver, which under Cochran and related Ninth Circuit authority provides that there is a presumption, the waiver is knowing, intelligent, and voluntary, the court followed up to just make sure that whatever medications he was taking were not impairing his judgment or his ability to understand the jury waiver. And the law in this circuit is clear that there doesn't have to be, there's more than any possibility defendant is impaired. There has to be a substantial issue of impairment, either psychological or emotional problems, learning disability, low IQ, language problems. There isn't on this record, and we would submit actually that the presumption in this case, the validity of the waiver should apply. And to the extent that there was some ambiguity about whether his hesitancy about whether he was under the influence was adequately followed up by the judge. On the I understand that there was a written waiver as well. Yes, indeed. When did he sign the written waiver? He signed the written waiver. His counsel signed the written waiver on October 5th, the date of the hearing. His counsel and government counsel, his counsel signed it on October 4th. So But he actually, he indicated on October 1st through counsel that he had been considering waiving jury and would make a final decision within that week. So we would also submit the record indicates his election of a jury waiver was actually quite deliberative. Counsel indicated he'd been thinking about it, and then there was a hearing on October 5th, and government counsel concurred, and the waiver was taken. And I'm not sure whether this makes any difference. At the time he had the colloquy with the district judge, had he already signed the waiver, or did it come after the colloquy? The waiver was on file, and that's one of the reasons the Court inquired with regard to the waiver. If you, not only did the Court The waiver had already been signed when the judge was doing the question. Yes, and the judge went over it with him. So the judge, there was two parts to the colloquy. One was, are you prepared to waive jury? Do you fully understand what your jury rights are? Is there a concurrence of counsel? Then the Court went over the written waiver at the October 5th hearing, and the record makes clear that the Court has that in front of it, and I think the Court, the defendant's asked, is that his signature, and so forth. If the Court doesn't have any further questions, I'd simply like to address the double counting issue. We would submit that under, the defendant makes two arguments for why double counting is impermissible. One relates to a provision of 3B1.3 that suggests that somehow under certain circumstances, if the abuse of trust enhancement is taken into account either in the specific offense characteristics or in the base offense level, it can't be applied. And we believe the Laurenti case is controlling on that issue. It makes clear that that prohibition only applies to categories of offenses. So if it is not the case that accessory after the fact, by its own nature, necessarily includes an abuse of trust enhancement or special skill enhancement, then it certainly, the Court can impose it if it's warranted on the facts. Counsel, what bothers me is that the comment seems pretty categorical. It doesn't really allow for much nuance. Well, if we're talking about note 14 to 2B1.1. Yeah. I believe that basically says if the section B18 enhancement applies, then don't apply the 3B1.3 enhancement. But if you look at the section 18 enhancement, it applies where the defendant, where a securities offense is involved and the defendant is either a broker-dealer, an investment advisor and so forth. In this case, that enhancement applied not because the defendant was a broker-dealer securities advisor. It was rather because the person who conducted the underlying offense was a broker-dealer. So that prohibition does not apply to this defendant. This defendant wasn't a broker-dealer. He wasn't an investment advisor. And he didn't get that enhancement because he had done anything relating to that. And that makes perfect sense. That enhancement actually relates to the gravity of the underlying offense. The gravity of that offense was, as it were, by the fact that Mr. Farahi, Mr. Taman's client, or at least his client through the corporation, was a broker-dealer. Then in addition to that, in covering up that offense, Mr. Taman used his special skill in order to facilitate the concealment. So under your theory, this special skill enhancement for the accessory after the fact would not apply if, for example, the brother-in-law of the principal decided to destroy evidence that he found in the garage, but it would apply if his lawyer engages, uses his special skills to falsify documents. That is correct. And actually, if you look at, let's assume just hypothetically that instead of being convicted of accessory after the fact, Mr. Taman was convicted of being a co-conspirator to the underlying fraud, and Mr. Taman was with Mr. Farahi a broker-dealer in Newpoint Securities. If that were the case, and then he were to be sentenced under the 2B guidelines, he would not be able to be subject to the special skill enhancement. And the reason for that is that basically if you're a broker-dealer or an investment advisor, you have fiduciary duties. And you're getting that, and that follows from that position. And accordingly, the sentencing commission decided, look, you've obviously breached your fiduciary duties if you engaged in securities fraud as a broker-dealer. We're not going to give somebody an additional bump for abuse of trust. But that's not what happened here. What happened here is Mr. Farahi was the broker-dealer. Mr. Taman had nothing to do with Newpoint Securities, the operation of Newpoint Securities. But when the SEC commenced its audit, Mr. Taman applied his talents as a lawyer to attempt to cover up the wrongful conduct engaged in. My question about the special skill is that he wasn't very skillful. Well, anybody who gets – I don't think it's true that people who get caught are not necessarily skillful. And I can represent that when these PPMs were provided to the SEC in June of 2009 with disclosures in them that appeared to indicate that at the time these debentures were sold, it was being disclosed that Mr. Farahi was personally borrowing millions of dollars from the investment fund, that looked pretty good. I mean, basically the rule in securities fraud is if you make disclosure, you're okay. You have to disclose all material facts. So those disclosures made it look like this investment scheme had been pretty transparent with the investors. They took their chances. But it turned out that those disclosures weren't in those PPMs. And I think you actually have to be a pretty artful lawyer to figure out that, hey, there's a way of changing the disclosure documents to put the SEC off its trail. The fact that the SEC followed up, sought to get metadata, interviewed other witnesses. Actually, eventually a receiver was appointed who took over Newpoint Financial Services, the receiver waived privilege. And then we got to see that, hey, these disclosures didn't start appearing in these PPMs until after the SEC commenced its audit. But that is not something that a lawyer necessarily would have figured out in advance, that a receiver is going to get appointed, privilege is going to be waived, and then everybody is going to see what I'm doing. So in any event, I do think it was essential to the conduct involving his role as an accessory that he exercise skills as a lawyer in terms of modifying disclosure documents and so forth. These were all documents that he had authored for a long period of time. What do we do with the payment that was made directly to Mr. Taman of $5,000 or some small amount? What do we do with that statement? There's been objection to it, of course, to admitting it. And the argument in the brief is that's the linchpin, because otherwise you have no motive for Mr. Taman to do this. Well, that was actually setting aside whether it was actually not objected to. So we submit that it would be reviewed for plain error. Don't they claim some sort of rolling objection or something? Well, but the objection was 20 pages earlier in the transcript, and the objection was to an enlisting that Ms. Amui, the bookkeeper who also pled guilty to obstruction, testified that Mr. Farahi had told her that Mr. Taman authored the PPMs. And there was an objection to that on the grounds that Ms. Amui was not a co-conspirator. And that objection was overruled, because Ms. Amui clearly was a co-conspirator. She actually pled guilty to obstruction and had destroyed documents. Your position is there was nothing to leave the district court under the impression that there was some sort of an agreement, that there was no need to object down the road? No. I mean, this objection is a different objection, namely that this was an in furtherance of the conspiracy. And that objection was not made, and the court couldn't make a record with regard to whether this was in furtherance of the conspiracy. As we argued in the brief, it was, in fact, in furtherance of the conspiracy. But setting that aside, this was not even argued in closing. It was not crucial motive evidence. What was crucial motive evidence was the fact that Mr. Taman had been Mr. Farahi's securities lawyer for a long time, and actually in 2004 had improperly changed some PPMs in order to mislead NASD in an audit. And our theory was then that Mr. Taman had already engaged in improper, wrongful conduct with Mr. Farahi, and so that when the SEC came calling in 2009, Mr. Taman understood that if Mr. Farahi got in trouble with the SEC, he was likely going to be in a world of hurt himself. And that was our theory. There's some argument in the brief that Mr. Farahi was just a drop in the bucket in the terms of how important his custom was to the firm. Well, my question is, how important a client was Mr. Farahi to Mr. Taman? Was there evidence introduced as to how much of Mr. Taman's time he spent working for Mr. Farahi? I think the evidence is that it wasn't a big part of his book of business, so we would not contest that. On the other hand, they had a long-term relationship. And Mr. Taman was solely responsible for all these PPMs. And the other key point is that in October of 2008, Mr. Taman was made aware, and this is in the record, and I think it's ER 381, he became aware that Mr. Farahi lost $26 million trading in investors' money in his own personal account. So at that point in time, Mr. Taman understood that this was serious, that there very well may have been securities fraud afoot. And if the SEC started poking around, they would also have a lot of questions of Mr. Farahi's securities lawyer. And the only securities lawyer Mr. Farahi had, at least in terms of these disclosure documents, was Mr. Taman. So Mr. Taman had a motive for wanting to cover this up and make the SEC go away. If the Court has no further questions, we will submit. Thank you very much. Just a brief reply on the hearsay issue. Nothing could be more incriminating than handing a lawyer cash under the table, proving that he stole money not only from his own law firm, because it was in lieu of the law firm being paid, but that he was being paid off. And that is so incriminating. It is so prejudicial. As to the other motive, my belief is the statute of limitations had long passed, number one. Number two, it was very disputed about whether he had done anything improper in the past. And so that piece of evidence was absolutely crucial, particularly in combination with the fact that he was not allowed to put on his expert, who could have demonstrated that absent that evidence, his only motive was going to be that he was in a very difficult, complex situation and he made a mistake. But he made a mistake which was done in good faith, which is a defense under the statute. Just one more point before I just briefly get to sentencing. I really call Your Honor's attention to the Shorty case. It's the most recent case in this circuit, and it clearly establishes that when there is an additional factor, please. We've read the case and we've used your minute. I appreciate that. On the sentencing? Okay. I'm sorry. The bench has questions. The bench has questions. I appreciate the time, Your Honor. Thank you so much. Thank you for the extra time. Thank both sides for their arguments. United States v. Taman is now submitted for decision.
judges: Ezra, Fletcher, Bybee